23-1217 United States v. Milliron. Counsel for appellant, if you would make your appearance and proceed. May it please the court, Robert Fishman on behalf of Lori Milliron. Before I begin, I just want to take a second to thank the court for your scheduling accommodation. I'm sure it caused some inconvenience. I appreciate it. The perjury charged in count six, the government tells us the problem with my client's responses to the question of why Mr. Rudolph was so generous with her was that she did not tell them initially that the reason was because she was involved in a long-term intimate relationship with Mr. Rudolph and that he had supported her financially throughout that relationship. But as the court knows, it wasn't more than five pages worth of grand jury testimony. It's hard to know for sure, but I estimated at about two minutes where follow up and better and more precise questioning elicited the very information the prosecution was after the entire time. So our position is that there are a number of things that follow from that fact. One is the question of the materiality of her initial statement that she did not know. And whether her comment that she could not know could be deemed material when within moments she gave the prosecution exactly the information it was after. And not just that, she actually explained her initial response and its limitations and what it was based on. And it was based on, of course, the lead up to the question, which was going through the document is not in evidence. I know there's specific references to page 165, a very large exhibit with what I assume to be hundreds and hundreds of bank deposits into Ms. Milron's account from Mr. Rudolph. Do we have to consider the statement she made in the context of her testimony as a whole here? And anticipating that you're going to say yes, what's your case for that? My case for that is... So do you say yes first? I do say yes first. And the case is Schulte, 10th Circuit, 2014. The context of the question is critically important in evaluating ambiguity in light of the testimony as a whole. That is a case dealing with ambiguity, and of course the argument I'm making is the question, why was he so generous with you, is ambiguous. I think the party spent a lot of time on the distinction between fundamental and arguable ambiguity. I think, as in Farmer, I don't think this court needs to take a position on that. Either way, it was ambiguous, and I think it does not support a perjury conviction, no matter what label you affix to it. Doesn't ambiguity suggest there are two different meanings? Isn't this just more vague than anything? I'm not sure that that is a distinction borne out in the case law. I mean, I think it is not clear what the question is asking. I think you could call that a vague question or an ambiguous question. Well, explain to me what the ambiguity is here, where there would be two different meanings and the defendant may have misunderstood. Why was he so generous with you when he gave you $200 on April 15th, $2,000 on May 19th? Because that is the lead-up to the question, is going through the bank records and the numerous deposits over a three-year period, and my client says, I don't know why. And then she says, additionally, I don't know exactly why. And then when she is pressed about her relationship and how long and ongoing it is and how he would give her money for whatever she asked for, she says, she explains her answer and says truthfully, well, I know that he was giving it to me because we were involved in a relationship. I just don't know exactly what each one is for. I can't tell you why he gave me $2,000 on May 19th, 2017. Mr. Fishman, it's my recollection anyway that in the run-up to those questions, they were talking about him giving her more than her salary in a year. It wasn't nickel and diming. It was talking about why did he give you such large sums of money? And in response to that, what is what is so ambiguous about she either knows or she doesn't? And and and supposedly she claims she didn't know, right? Well, she both she both does know and does not know. As she explains, she knows that she's that she's getting $60,000 in 2017, for example, because she's involved in an intimate relationship with this man. She does not know why he gave her $2,000 on May 19th. Well, the question related to the $60,000 and she could have responded just in the way that you indicated that she was in an intimate relationship with her. And therefore, that relationship had a financial connection. And I'm not saying quid pro quo, but it had a financial connection to it. And and that would have been presumably material to a jury that's trying to determine whether Mr. Rudolph had a motive to kill his wife to get the insurance proceeds. Right. Sure. And the argument would be much more compelling, in my view, if she had not actually told the grand jury all of that, which she did. And as we know from the case law, it is precise probing questioning. That is the burden of the examiner to ferret out the meaning of answers that the examiner is not satisfied with and to press the witness for more precise answers to elicit the information the examiner is after. That's what the law says. That's what the Supreme Court says in Braunston. It's exactly what happened in this case. And when you spoke to her providing the information that she that was at issue here, that information related to the romantic relationship related to the fact that he gave her money. Right. That that isn't that a separate question from what his motivation was in giving her the money? Well, I think that also goes to I think that also goes to the ambiguity of the initial question, because if it's construed as motive, maybe it is a quid pro quo. Maybe it's because he's generous. Maybe it's because he wants to see the relationship continue. It is different, I think, distinguishable from what was what. Why did he give you this money and not other employees? The motive. There can be all sorts of motives that Mr. Rudolph had that are distinguished from the fact of their relationship. The government. And I mean, what what basis would there really be to believe? Did he give any other employee double their salary? No. But as as Miss Milron said, he was very generous with lots of employees and gave them extra money for all sorts of things. Let me let me ask you a question. I just want to make sure we're we're sticking with the record here. Does the record demonstrate how much money he gave other employees? Not with just sort of anecdotally. I mean, we know, like she said, he bottom washers and dryers gave him money when they needed help. I mean, I think I I think it's a fair reading of the of my client's grand jury testimony and the trial testimony. And it's fair to assume that she received much, much more money from Mr. Rudolph than anybody else. OK, is the ambiguity as I'm understanding it here today and I didn't understand it before. You're saying the ambiguity is and asking what was this particular chunk of money for? And the 60000 would be a different answer than 2000 of the 60000. I think it's broader than that, Judge Phillips. I think it is both in ambiguity in the sense of are you asking me what Mr. Rudolph's motive was and and how am I supposed to know what is really motivating him here? Her initial answer suggests she thinks this is and I would say reasonably she thinks this is a character question. She says, I don't know. But, you know, he was a generous person. So why is he giving me so much money? Because he's a generous person. Well, one time she answered the question. I don't know. And later she answered the question. I do know. Why is that contradiction not enough? Well, it's not enough because she explains she explains the seemingly contradictory answers. And the contradiction is she knows she's getting this money because she's involved in a relationship with the man. She does not know why she was given two thousand dollars on May 19th. So she both knows and doesn't know. And she is telling the grand jury she is explaining her initial answer and the limitations of it. I know I'm involved in an intimate relationship with this man. And that's why he's paying me sixty thousand dollars. Well, that's why he's giving me sixty thousand dollars in 2017. I can't tell you what any of those individual deposits are for. And so when the prosecution is walking me through this document and asking me about these deposits, I just can't say. But now that the examiner has clarified and I understand that he's really not it's really not about sixty thousand dollars per se. And it's really not about two thousand dollars on May 19th. It's about the fact of their relationship. And when she understands that, she says, oh, well, yeah, sure. I mean, if that's what you're asking, yes, we're involved in a long term intimate relationship. Let me let me shift gears for a second. Mr. Fishman, I want to talk about the multiplicity challenge, the double jeopardy challenge. And as it relates to that, there was no rule 12B3 motion filed on double jeopardy grounds in the district court. Right? Correct. And and there is no argument made here for good cause as to why we should consider this argument. I did not make a good cause argument. What I did was I cited U.S.V. Hardwell, which says double jeopardy claims can be raised for the first time on appeal and considered de novo. I recognize Hardwell, but the reality is rule 12B3 is pretty clear that you're supposed to raise a double jeopardy argument. If you don't raise a double jeopardy argument, it's waived. But for a showing of good cause, I Hardwell says what Hardwell says, but it seems to me that there what is the. Well, help me then reconcile Hardwell with the with the plain language of that rule so that I know what to do. All I can tell your honor is is the rule that you're well aware of, that one panel is bound by the decision of another. And Hardwell says what it says. And that's what I'm relying on. I can't I can't give you anything more than that. I understand the provisions of Rule 12. I understand the typical rules that apply to waiver and preservation. And I read Hardwell and I say Hardwell says something different. OK, I take it that there is no dispute on going back to perjury now. There's no dispute that all you need was one of the statements. Right. I mean, the district court gave the district the district court gave an instruction which is not contested here, which said that the jury only needed to find in these counts that had underlying statements that were perjurious, allegedly that only one of them was, in fact, perjurious in order for the count to be sufficient for purposes of guilt. There's no dispute about that. Right. Unanimity as to each perjury count is essentially what you're saying. Yeah, there's no dispute about that. No, the court didn't know. That's not what I'm saying. What I'm saying is that, for example, in count six, there were two, two specific statements. And as it relates to that, as I read that instruction and as our case law, I think supports the notion. I don't know. I don't know why. And I don't know exactly why in count six. All you need to find is one of them. I don't know why. That's correct. OK, I agree with that. I think I'm going to reserve the remainder of my time for rebuttal. If there are no questions, it's fine. May it please the court. Marissa Miller for the United States. I'd like to start just really quickly by addressing the court's questions about Hardwell. If you do, if you look at the Hardwell opinion, it cites a previous case from the 10th Circuit, which is 9844 South Titan Court. And that's a case in which this court said that double jeopardy claims can be reviewed for the first time on appeal. But they are subject to the plain error standard. So when Hardwell says you can address them for the first time on appeal, it's really just reiterating the rule that you can address it for the first time on appeal under the plain error standard. And after this court's decision in Leffler, the fact that Ms. Miller didn't brief the plain error standard means that this argument has been waived. Well, is the plain error standard actually the operative standard here? I mean, we've had in the context of, for example, Burke, where we dealt with the suppression motion issue. And we said that the rule actually, when you construe the law, the rule is the operative principle, not our jurisprudential plain error standard. And under the rule, as opposed to invoking plain error, you have to invoke good cause. You're nodding, so I take it you're following along with what I'm saying. Yes, Your Honor. And my probably unsatisfying answer is that because Ms. Miller didn't argue good cause or plain error, that's not something that this court really has to resolve. I'd like to push back a bit as well on Ms. Miller's discussion of the perjury charge in Count 6 and this idea that the context before the government's question made it confusing as to whether the government was asking about specific payments or the payments as a whole. And that's Supplemental Volume 2. It starts at 354. There really are very few questions, if any, about specific payments and what they were made for. Instead, the discussion that occurs before the government's question is really all about, you know, did your other co-workers receive a similar amount? It's not credible, and I think that is the reason that that's the same conclusion the jury reached to say that she was confused by this question because it was asking about specific payments. What is the government's answer to the truthful answer to, why did he give you this money? What do you say the truthful answer was? You know, certainly the answer we were hoping for was I don't want that. I want to know what the truthful answer is that she perjured herself on. It's that she was in a relationship with Mr. Rudolph. And there are all kinds of reasons that someone in a relationship may give money to the other person. It could be, I love you dearly. It could be, please don't tell on me. It could be, I've got this problem with this hunting group and I've perjured myself in that and if you say a word about it, I'm really going to get my house burnt down. And so even if, I just don't understand right now and that's what I need help with, is why she didn't have to pin the witness down on that. In other words, she doesn't know if he's scared of her, if he's in love with her, if he's hunting. She just can't know that. So I think my response to that would be, we again really have to focus on the whole context. You have someone who's been in a romantic relationship with their co-worker for 10 years. The government is asking you all these questions about this time that your co-worker gave you thousands of dollars in cash and whether the other people in your office got that cash. And then the government asks you, why was this co-worker so generous to you? I think intuitively you are going to understand that the government is asking about the nature of your relationship. Well, I just gave you alternatives, alternative answers that are not the same. And one of them would be truthful, one of them would not be truthful. So I would disagree with that. I think there can be multiple truthful answers to a question. But the answer given here, I don't know why, was not true because she did know why. What if he was afraid that she would tell on him and that's why she gave the money? If she had said that, then presumably we would not have charged her with perjury. Well, that's different than he was in love with me. Again, Your Honor, I do think the fact that you can answer the question in different ways doesn't necessarily mean that it can't be perjury. It's not different ways, it's different answers. The question is, why did he give you money? Get inside his head and tell us under oath why he gave you money. Not your understanding of it, but why he did that. And he was afraid of me or he was in love with me are two totally different things. Your Honor, I would also, I think, point out that we are under the doctrine of arguable ambiguity. And so this is ultimately a sufficiency of the evidence analysis, which means it doesn't necessarily matter how this court might have decided the issue if they were on the jury. The jury was given a question, which is, how did Ms. Milliron understand this statement? Was she genuinely confused by it? Or did she know exactly what the government was asking? And I think looking at all the evidence, a rational fact finder could conclude that Ms. Milliron understood exactly what the government was asking. Would we know the first time that she was asked about the relationship, she admitted it? She didn't ever say, we weren't in a relationship. That would be perjury. Yes, Your Honor, she did admit it, but the crime of perjury is committed right once that false statement comes out. You can't undo it. And certainly we can look at those statements, but I think that the record kind of belies the claim that Ms. Milliron was just candid about her relationship with Mr. Rudolph when the government asked. Well, how about this? We have a case, U.S. v. Hilliard. It says a perjury conviction may not rest on an answer that is literally true, and assuming that Judge Phillips has pinpointed it here, and that that question that was asked is asking for Rudolph's state of mind to which she can't for sure know, so it's literally true but not responsive and arguably misleading by negative implication. We said that can't give rise to a perjury conviction. So that seems to be a problem for you. And I guess the other problem I have is we seem to all agree you have to look at it in context, and for several pages before this, she at least had been talking about specific things, why she was getting money from Rudolph, and why was he giving you money? He would help me out. For what? Expenses. What kind of expenses? A variety of things. Can you provide me some examples? To pay bills and for education, and then various places throughout this, she talks about other things he was giving her money for, but then we switch over here. And she does say Larry was a very generous person. Why was Larry so generous to you? And she says, I don't know why, but like I said, he would give other people things. And then she didn't just, then the next question was not, I'm not asking you why he was giving, what you were buying with it. I want to know why he gave it to you. That was not the question. And the next question is, so your testimony before the members of the grand jury today is that you don't know exactly why. I mean, that's a softball, isn't it? For her. No, I don't know exactly why. Did he tell you why he was being so generous? He helped me with things. So to take your questions kind of in reverse order. I mean, it's a compound question. It's fundamentally ambiguous. I don't agree with that. I think you know exactly what I'm talking about. And I think it's for the jury to decide. Sorry, Your Honor. So talking about the literal truth defense, which comes from the Supreme Court's decision in Braunston and is discussed at length by this court in the strong opinion, there are two requirements. One is that everyone agrees the statement is true, and the statement is not responsive to the question that was asked. That is not the case here. But you seem to think that the statement can only be true if it agrees with your theory of the case. The statement can only be undisputably true if both sides agree as to how to interpret it. So there can't be literal truth. What happens to all the witnesses who come and testify at the grand jury, but they testify in a manner that is ultimately decided by a jury to be different? Are they subject to perjury? I think that the doctrine of arguable ambiguity is what comes into play once we're talking about interpreting the government's questions differently. And at that point, it becomes very much a question that is left to the jury because it is a factual dispute that hinges on things like credibility and common sense. I'm trying to remember. We were talking about context. Yes, context. So the whole context, I think, you know, you quoted what Mr. How much context do we get? Do we get the whole transcript, or do we just get a few lines before and after? You get the whole transcript. It was placed into evidence, and certainly you can look at the whole transcript. And here are two parts of the transcript I would point you to. One is that when she says, I don't know why Larry was generous, here's what she says afterwards. But like I said, he would buy other staff members washers and dryers. He would give them cash if they needed it. What she's saying is he gave the others money too. She's implying that she's not special. She's just like the other coworkers. And what that means is that she understood the government's question perfectly. She knew that the government was asking about what set her apart from the other coworkers in her relationship with Mr.  So would you say, was she being evasive? Yes, Your Honor. Okay. Is being evasive sufficient to get you a perjury conviction? Not by itself. Okay. But a false statement based on how the jury believes that the defendant understood this question is sufficient. And that I don't know why was a false statement. Well, if you say that at issue is whether she understood that the question was designed to elicit whether she was special. Well, and as I understand it, we can consider the whole transcript. Well, she later goes on to explain why she's special. And she later goes on to explain that part of that specialness, at least was it manifested in Mr. Rudolph's case, by giving her stuff. And so why, if we can look at the whole context, can one determine that that was perjury? Particularly since, at least I think that some members of the panel believe that that statement was vague. I mean, the question of why was she so generous to you? I mean, she explains later why he was generous to her. Because they were in a relationship. Because she was special. I think ultimately the fact that the prosecutor is successful in pinning down the witness in the situation doesn't change the fact that perjury has already been committed. So. Well, yeah. Let's talk about that. Pin down. Well, it's not like he said the question is the light green. She said, no, it's red. Later she says, oh, well, the light really was green. You don't have that sort of clear clarity here. You have a situation where why did he do it? I don't know. Later she says, oh, well, I really do know. And I'm going to tell you why. Explain to me how you reconcile those two examples. I mean, I think the fact that you can't reconcile them is what makes the statement false. She's saying she doesn't know why Larry was generous, and then she's saying, oh, I do know why. And I think the way that we interpret, or at least the way the jury chose to interpret that, is not someone who's saying I misunderstood the question. That's someone who's been caught in a lie, and they are essentially trying to excuse it. She'd be caught in a lie if she said we weren't in a relationship. That would be a lie. Yes. But all of this mushy stuff just isn't the same as saying we weren't in a relationship. She gets asked directly, Ms. Milleron, were you in a relationship with Larry Rudolph? This is the first time it's been approached. Answer, one word, yes. I think the fact that she later tells the truth under this court's case law. Later tells the truth because she's asked the question. And when you say pin down, if this is pinning down a witness, it's an awfully big radius. I think the case law is clear that the perjury happens once the false statement has been made, and we don't get to look at whether or not the prosecutor was skilled enough to ultimately get a confession from the witness. So aren't the cases you cite different, though? For example, the Supreme Court case you cite, the name escapes me, the guy came back the next day after somebody else had already testified in the meantime and wanted to recant. And even our own case, which was arguably dicta, I'm talking about the Fernandez-Baron case, it came out on cross-examination, not out on the direct. In this grand jury testimony, this was not very, there was not a lot of space in between these questions. I have not seen anything in the case law that to me indicates that when someone cleans up their testimony after sort of being pushed into a corner, that that precludes a perjury conviction. I think that certainly the onus is on the government to ask good questions and to be good at getting the answers from the witness. But that can be true in addition to the fact that not every question is perfect, right? The whole point of the doctrines of fundamental ambiguity and arguable ambiguity is this recognition that ambiguity is inherent in all language. And what it tells us is that unless the prosecutor's question is truly so ambiguous that no one can really understand it, we're going to leave these questions to the jury. Let's use, I want to go back to Judge Phillips' colloquy with you, and essentially this is the line of reasoning. If you say, well, why was he so generous to you? Now, Ms. Milliron could have in her mind, we have a relationship. He may be trying to silence me. He may be trying to, he wants to maintain his connection to me, which is not necessarily, it's related but not the same thing as he loves me. Okay, it could be all of those things. That's what she says. She says, well, it could be three things in my head. I'll just say I don't know. Later the questions are asked in a way where it is very clear to her what the prosecution is getting at. And in that situation, she tells you exactly that. He's giving me the money because we're in a relationship and essentially, you know, he loves me, he's in a romantic relationship with me, whatever. That's the example. Is the first one in that situation perjury? I mean, when there are, like, in her head, conceivably, she could have four or five answers, three answers, let's say, to that question. So because she doesn't know really which one to give, she says, I don't know. And when it's clearer later which one you really wanted, the prosecutor really wanted, she gives that answer. Where's the perjury in that? Your Honor, I would say that, sorry, and I see my time has expired. Well, I want to hear it, so please, go ahead. My response to that would be that regardless of what we here on appeal think, looking at this cold transcript, this is ultimately a question that gets left to the jury. And the jury, you know, Ms. Milliron can spend all day saying that she was confused by this question, but it's the jury who gets to decide whether that's a credible claim. And in this case, the idea that she was confused by this question, that she was confused, the reason she said, I don't know why, is because she couldn't choose between all of the different true answers in her head, the jury rejected that, and a rational fact finder could have made the same conclusion. And so just to be clear on what that theory is, the theory would be that a rational fact finder, particularly when she includes this language about they gave washers and dryers or whatever that subsequent language is, the rational fact finder could say Ms. Milliron knew that what the prosecutor was getting at is what made you different than the other employees, and based upon that conclusion, which would have been rational, she lied, because she knew that she was different than the other employees. Yes, Your Honor. Okay, I just want to make sure I understand. Chief, can I ask one more question here? Of course. The second potentially perjurious statement, or different category, I guess there were two statements in the first count, and then we're looking at the next one, it says, as you sit here today with members of the grand jury, you don't recall a conversation with Mr. Rudolph about an FBI investigation. She says, there has been conversation about that, but I think he was aggravated. I can't give you specifics. Can you give me generalities? To which she says, irritated that there was an FBI investigation because he felt he was innocent. Next question, did he ever tell you that he was just going to go and speak to the FBI? Don't you think it's problematic that you ask for an answer in generalities? And she brings up this thing about him feeling that he is innocent, and there's never any further questioning on it at all. It goes straight to the investigation, and you're like, oh, it's a lie. She didn't really, she didn't really feel like, she didn't really, he didn't really say anything that made her feel like he was innocent. I mean, we have no way of knowing that. I mean, there's no way of knowing that. So, Your Honor, I guess a few points, if I may. So count nine is based on two statements. So there's that statement, and then there's the statement asking if, in these conversations about the FBI investigation, did he ever tell you he was innocent? And she says, probably I don't really recall. And so the government's theory here is that it simply wouldn't have made sense for him to tell her he was innocent or I feel innocent, because by the time the FBI investigation is happening, we know for a fact that Mr. Rudolph has already told Ms. Milliron that he killed his wife. Now, that was disputed at trial. It was certainly disputed at trial, but, again, we are under a sufficiency of the evidence standard. And you do have a witness who said, I could have missed the first few words of that sentence. I would say viewing the evidence in the light most favorable to the jury's verdict. Okay. I agree it was disputed, but there's the other evidence, too. There's the propofol order. There is the text after it happens. The government presented ample evidence that Ms. Milliron always knew that this was going to be the plan, right? The government has also accepted, though, that he said it was an accident to her, right? Yes, Your Honor. And you've criticized her for not exploring further the idea that it was an accident, but nobody disputed that he said to her that it was an accident. Yes, Your Honor. Right? Okay. There's no other at least plain clear evidence as to what else he said to her about whether it was or was not an accident. I mean, the statement in the restaurant. Yes, Your Honor. Okay. Fair enough. If there are no further. Well, just answer me on the generalities. I mean, if you ask someone, tell me in generalities, I mean, isn't that a big problem for you? Aren't you asking them to summarize something for you? I don't think that that's necessarily a problem when the witness responds with a lie. You know, I think it's a problem because you might not get the answer you're hoping for, and it's a pretty easy question to evade, but she still didn't evade it. He would never have said, I'm innocent, because she knew. Why? Why could he not have told her, well, assuming she's involved, oh, the FBI is breathing down my neck, they're going to come to you next. It would really help me out a lot if you told them that I said I was innocent. So I'm telling you right now, I'm innocent. We can certainly come up with some bizarre scenarios in which he does just tell her he's innocent, right? Maybe he's gaslighting her. But this is sufficiency of the evidence. We don't have to exclude every remote possibility in order to uphold the jury's verdict. We just have to conclude that it was rational. But you're emphatically saying it's a lie. You're not saying it might have, three-quarters of the time this would be a lie. You're saying 100% of the time it's a lie. That's why we get our conviction. And I'm telling you, it's not 100% with my example. I think the protection in that situation comes from leaving the question to the jury, and the jury resolved it against Ms. Milliron, and it was rational for them to do it that way. Are you saying 100% of the time it's a lie? I mean, under a sufficiency of the evidence standard. I'm saying it was up to the jury to decide yes or no, was it a lie? So, you know, it could have been 70% was a lie, and a different jury would have come out differently. But I think there's enough here to justify the jury's conclusion that this was, in fact, a lie. What about pinning down the witness on this point, which is reading the government's brief, it says did he profess his innocence, I don't have the right word, maintain, proclaim. Did he proclaim his innocence? And then in the government's brief it says to you, but it doesn't say to you in the transcript. Why couldn't it be more general? Yes, he's out there telling all the FBI guys he's innocent. He told the insurance companies he didn't do anything wrong, and they gave him $4.8 million. Yeah, I mean, I think that would have been an interesting argument about ambiguity if it had been raised in the opening brief by Ms. Milliron, but there's no argument as to the ambiguity of this claim. So I think that the idea that Ms. Milliron was confused as to whether the government meant did he proclaim his innocence ever to anyone versus did he proclaim his innocence to you, I mean, we could talk about the context that would have made it clear that they were talking about their private conversations. There's also the fact that later she says he never spoke about the murder to anyone else. So the idea that she's even testifying about him telling the insurance agents that, you know, she doesn't recall overhearing any conversations where that happened. So I don't think that's a credible interpretation. Should we be looking at the literal language as the proper role of a reviewing court? Or do we just say, well, jury could conceivably come up with that answer, so hands off. Don't we look at the exact language that's used? I think this court's decision in Strom makes very clear that there is ambiguity in language all the time and that once we get out of the zone of fundamental ambiguity— Here's where there's none. Were you in a relationship with him? Everybody knows what they're talking about, and she says yes. So it's not this world where every word that's uttered, who knows what it meant. I mean, this could have been asked a lot more clearly. Do you concede that point? Yes, Your Honor. Okay. Thank you, counsel. Let's look at seven minutes, if you want it. Thank you, Your Honor. Could I ask you a question right off the bat?  The chief was generous with the time. What if we reversed on one of the perjury counts? Where does that leave you? No better off? Well, it depends. If it is the perjury charged in count... I'm sorry. If you only reverse on one, that would defeat argument number three. Insufficient evidence on perjury means insufficient evidence, particularly on count four, but also three, we argue, would defeat that argument. The argument that perjury cannot satisfy the requirements of accessory liability under 18 U.S.C. Section 3, that is unaffected. Would not affect a double jeopardy analysis. She wouldn't have a special assessment. Right. I mean, it matters, right? It does matter. It does matter. But I think for the reasons that the court discussed with my colleague, I think that neither perjury conviction can survive. And I want to be clear on one point, that I kept hearing the suggestion that if you're in the realm of arguable ambiguity, hands off. That is for the jury to decide. Juries are best equipped to decide questions that arise in that context. The suggestion almost seemed to be this court can't sort of review a conviction that is premised on arguable ambiguity. And, of course, that's just incorrect. It's a sufficiency claim. It's subject to de novo review just like any other sufficiency claim. Yes, it's a sufficiency claim. But I think what, at least as I interpret it, the government's position, it is that once you get out of the realm of fundamental ambiguity, the question becomes is there a reasonable range of how to interpret the response? And is one answer in that reasonable range perjurious? And if a rational jury could find, even though all the others were not, that one of them is perjurious, then we have nothing else to talk about because on a sufficiency of the evidence analysis, that's it. And so one of the interesting and unusual things about this case is it is not, Strom says, plumbing a question for ad hoc ambiguity will not defeat a perjury conviction. Where the evidence demonstrates the defendant understood the question in context and gave a knowingly false answer. That is not what's happening here. It's quite unusual because, in this case, the testimony itself is the explanation behind the ambiguity, the explanation behind the initial answer, the initial denial, the subsequent admission. So this is not some clever lawyer argument being made after the fact where we could say, well, a jury would have never bought that. You said the testimony itself, but you're talking about the later testimony where she clarified the nature of her relationship with Mr. Rudolph, right?  Well, that does not necessarily defeat, does it, a determination of actual perjury in the moment. In other words, a scenario in which the jury could find, in moment A, there was perjury. And then Ms. Millard says, oh, wow, I lied in moment A, so I better start being truthful in moment B. The government can still convict her on moment A, right? Well, I would say, as an abstract principle, not always. And the reason I say that is because, of course, the initial question, there is the question of ambiguity, there is the question of the subsequent clarification. I am with Judge Carson that the government does not cite any case law that is controlling that says, once you give a dishonest answer, the cat is out of the bag and you cannot undo that. It's just pretty clear that when a witness concludes his or her testimony, comes back the next day, hears somebody else testify in a way that is inconsistent with his testimony, and he stands up and says, I'd like to retake the stand and recant. So it's your theory that, and I'm sorry to interrupt, but it's your theory then that if the prosecutor says, is the light red or green, and you say falsely that it's red, and in the same context of that grand jury testimony, before it ends, you go back and say, oh, well, I know I lied there. And so as it goes on, you say, well, you know, by the way, it really was green. And you're telling me that in that situation, the government could not prosecute that person for that false statement?  No, but what I'm trying to say is that a closer analogy would be, was the light red after the witness is questioned about the long line of traffic he sat in before he got to the intersection? Yeah, the light was red. Oh, wait, you're asking me if the light was red when my car went through it? No, no, it was yellow at that point. But I saw the red light 15 times as I was sitting in line. There's some ambiguity in the initial question. It is clarified later. The government gets the answer that it wants. My answer to you, Judge Holmes, is yes. That is not the stuff of a perjury conviction, both because of ambiguity and because of materiality. You do a better job with your questions, and you elicit the exact information you want. And I have to read, it's in our brief, but I've got to read it. I've got to read it to the court because it's so on point with our discussion today. Sayings, it's the Ninth Circuit case. In this case, the defendant's response was literally truthful, but apparently unresponsive to the questioning prosecutor's intended meaning. Once the question's ambiguity was narrowed somewhat by further questioning, the defendant gave a literally true and responsive answer consistent with the prosecutor's intended meaning. Rather than constituting an example of the corruption of our system of justice through perjury, this sequence of events shows our system working properly. I liked your hypothetical, and I'm trying to think about it. And what occurs to me, however, is in that hypothetical, where you have that series of lights and they respond red initially, if a reasonable jury, by virtue of the context of that response, could say you understood that they were talking about the prior lights, not the one you were going through, per your yellow to red, even though it's mushy, they could convict, could they not? I mean, I think the court would have to review the record as a whole and say, it's just too ambiguous. You cannot say definitively that given the ambiguity in the question, we know that he understood what the question meant, and the prosecutor was asking about the light at the time the person crossed into the intersection. And the reason is explained in Strome. Precise question is imperative as a predicate to perjury. Courts have required, quote, near absolute clarity from the questioner in order to support a perjury conviction. So we can argue about what individual jurors might dream up, but you can't do that untethered from the legal principles and the standards that the government has to meet in order to maintain a perjury prosecution. Courts have required absolute clarity, but Strome didn't require absolute clarity, right? It articulated an arguable ambiguity standard. I mean, it says near absolute clarity. That's a quote from Strome. I'm asking you, did Strome adopt an arguable ambiguity standard? Well, I'm not disputing that there is a doctrine of fundamental ambiguity and arguable ambiguity. I'm not disputing that. I'm saying that when you apply even arguable ambiguity, the burden is on the examiner to be precise and elicit the testimony he is after. The burden is not on the witness and the risk of getting it wrong, of not knowing what's in the mind of the examiner, does not lie on my client or any other criminal defendant. Well, in my view, at least I thought it admitted to, the government is not going to get a gold star in this case for the clarity of its questions, but that leaves us still with the issue to decide. Yeah, we're after a little more than that. Understood. I'm sorry, has that already been seven minutes plus? Yeah, plus. Time flies. All right, time flies when you're having fun. That's true. All right, the case is submitted. Thank you for your fine arguments.